**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**FORT MYERS DIVISION**

SHAWN SPENCER and STEVE WARLL,
individually

Plaintiffs,

v. Case No.: _______________

GEOFF LITERSKI, individually,

Defendant.
________________________________________/

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs, Shawn Spencer ("Spencer") and Steve Warll ("Warll"), individually and as members of Clean Print USA, LLC ("CPUSA" or the "Company"), sue Defendant Geoff Literski ("Literski"), individually, as majority member of CPUSA, and as owner of Ecochem Australia Pty Ltd. ("Ecochem"), and allege as follows:

## NATURE OF THE ACTION

1. This is an action for breach of fiduciary duty and breach of contract arising from Defendant's systematic self-dealing and mismanagement at the expense of Clean Print USA, LLC CPUSA and its minority members, Plaintiffs Spencer and Warll.

2. Literski induced Spencer and Warll to invest a combined $470,000 in CPUSA on the promise that the venture would be profitable and would generate distributions to all of its members.

3. Instead, Literski has used his majority membership interest and his ownership of Ecochem — CPUSA's sole product supplier — to enrich himself and his own company at CPUSA's expense, and has otherwise engaged in self-interested transactions in disregard of his duties to CPUSA's minority members. Among other things, Literski has: caused CPUSA to purchase approximately $6,000,000 in product from his own company while no member of CPUSA, including Literski, has ever received a distribution; unilaterally and repeatedly rewritten CPUSA's payment terms with Ecochem based on his own unsupported assumptions; manufactured a pretextual claim that CPUSA is out of trading terms based on his own self-serving misreading of an ambiguous inventory provision that he personally drafted; diverted CPUSA business and revenue to Ecochem, HarperLove, Inc., and other competing distribution channels while denying CPUSA the rebates, tariff relief, and marketing support afforded to those channels; refused, since CPUSA's formation in July 2022, to obtain and provide the taxpayer identification number necessary for CPUSA to properly report his share of the Company's income, exposing Spencer and Warll to substantial personal tax penalties, fees, and interest; and refused to authorize CPUSA to pay the wages necessary to maintain workers'

compensation coverage, exposing CPUSA and its members to regulatory shutdown and personal liability.

4. Plaintiffs bring this action to recover the damages caused by Literski's breaches of fiduciary duty and breach of contract.

## PARTIES

5. Plaintiff Shawn Spencer is, and at all relevant times has been, a citizen of the State of Florida, residing in Charlotte County, Florida. Spencer is a member of CPUSA holding a 20% membership interest and serves as CPUSA's general manager responsible for its day-to-day operations.

6. Plaintiff Steve Warll is a citizen of the State of New York, residing in Manhattan, New York County, New York. Warll is a member of CPUSA holding a 16% membership interest and serves as CPUSA's tax partnership representative under 26 U.S.C. § 6223.

7. Defendant Geoff Literski is, upon information and belief, a citizen and resident of Australia. Literski is a member of CPUSA holding a 64% membership interest, and is the founder and sole owner of Ecochem Australia Pty Ltd., an Australian company that manufactures the biochemical cleaning products that CPUSA purchases and distributes in the United States.

## JURISDICTION AND VENUE

8. This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2) because this is a civil action between citizens

of a State (Spencer, a citizen of Florida, and Warll, a citizen of New York) and a citizen of a foreign state (Literski, a citizen of Australia), and the amount in controversy exceeds $75,000, exclusive of interest and costs.

9. This Court has personal jurisdiction over Literski because he is a member of a Florida limited liability company that transacts substantial business in this District, he has purposefully directed his conduct at CPUSA and its Florida-based operations, and he has expressly consented to jurisdiction in this District pursuant to Section 7.8 of CPUSA's Operating Agreement.

10. Venue is proper in this District under 28 U.S.C. § 1391(b) and pursuant to the parties' express agreement in Section 7.8 of CPUSA's Operating Agreement, which provides that, if mediation fails, "the members consent and agree to the exclusive jurisdiction and venue of the state and federal courts located in Lee County, Florida." Lee County, Florida is within the Fort Myers Division of the Middle District of Florida.

## FACTUAL BACKGROUND

### A. Formation of CPUSA and the Parties' Investment

11. Literski met Spencer and Warll in approximately October 2021. At the time, Literski was selling Ecochem's cleaning products in the United States through non-exclusive distribution agreements, and he proposed forming a joint venture with Spencer and Warll — both executives of Dicar Inc., a

manufacturer serving the corrugated packaging industry — to distribute Ecochem's products in the United States.

12. Literski proposed that the joint venture be structured with himself holding a supermajority membership interest, notwithstanding that he would not contribute any capital, while Spencer and Warll would each invest $350,000 as their initial capital contribution.

13. CPUSA was formed on July 1, 2022. Its members executed an Operating Agreement on July 16, 2022, under which Literski held a 68% membership interest and Spencer and Warll each held a 16% membership interest. In exchange for his supermajority interest, Literski agreed to contribute a distribution agreement with Ecochem, a perpetual license to Ecochem's patents, and CPUSA's exclusive right to "all accounts trading with CP[USA]." A true and correct copy of the Operating Agreement is attached as **Exhibit A**.

14. On March 22, 2023, Literski transferred 4% of his membership interest to Spencer, resulting in the following membership interests: Literski (64%), Spencer (20%), and Warll (16%).

15. As an inducement for Spencer and Warll to invest in and join CPUSA, Literski represented that CPUSA would be profitable and would generate significant distributions to its members. To date, Spencer has contributed $270,000 and Warll has contributed $200,000 toward their initial

capital contributions — a combined $470,000 — while Literski has never made any monetary capital contribution to CPUSA.

### B. The Distribution Agreement and Literski's Control Over CPUSA's Sole Product Source

16. On October 10, 2022, CPUSA entered into a Non-Exclusive Distributor Agreement with Ecochem/Clean Print Solutions[1] (the "Distribution Agreement"), pursuant to which CPUSA would purchase Ecochem's products for marketing, distribution, and sale in the United States. A true and correct copy of the Distribution Agreement is attached as **Exhibit B**.

17. Literski personally drafted the Distribution Agreement on behalf of Ecochem.

18. Section 3.3 of the Distribution Agreement provides that "[t]rading terms will be payment 30 days from landing at the closest Port to CPUSA."

19. Because Literski is the founder and sole owner of Ecochem, every dollar CPUSA pays to Ecochem for product flows directly to Literski's own company, notwithstanding that Literski has never contributed any capital to CPUSA.

20. Since CPUSA's formation, CPUSA has purchased approximately $6,000,000 in product from Ecochem. Despite this substantial volume of

[1] According to the Clean Print Solutions website, CleanPrint Solutions is the international brand name for Ecochem P/L. https://www.cleanprintsolutions.com/about-cleanprint

purchases and revenue, no member of CPUSA — including Literski — has ever received a distribution from CPUSA.

21. Literski has never agreed that distributions be made to the members of CPUSA.

### C. Literski's Unilateral and Self-Serving Manipulation of Payment and Inventory Terms

22. Notwithstanding the express 30-day payment term set forth in Section 3.3 of the Distribution Agreement, Literski has unilaterally shortened CPUSA's payment terms — first to 7 days, and more recently to demanding prepayment — without the agreement of Spencer or Warll, based on his own unsupported assumptions about CPUSA's payment history and financial condition rather than any accurate assessment of the facts.

23. As a result of Literski's unilateral and improper demand that CPUSA prepay for Ecochem products, CPUSA has been unable to supply products to its customers which in turn has damaged CPUSA's reputation and standing with its customers.

24. Literski has threatened that if CPUSA cannot supply the Ecochem products to its customers as a result of not prepaying for the products, then Ecochem will sell and supply the products directly to the customers. See September 1, 2026 email from Literski to Spencer and Warll attached as **Exhibit C**.

25. Literski has separately taken the position that Section 4.3.4 of the Distribution Agreement — which he personally drafted, and which provides that CPUSA "must maintain enough stock to ensure deliveries to customers' maximum time stock delivery from order placement is 3 months" — obligates CPUSA to maintain, at all times, a standing inventory equal to three months' worth of product, a reading that would require CPUSA to carry in excess of $500,000 in inventory at any given time.

26. Spencer repeatedly explained to Literski that maintaining three months of standing inventory was not always financially practical for CPUSA, and that it was difficult to reliably project customer demand more than 120 days in advance.

27. The more natural reading of the ambiguous language in Section 4.3.4 caps the permissible time from a customer's order to delivery at three months; it does not impose a freestanding requirement that CPUSA carry three months of inventory on hand regardless of actual or anticipated demand. Literski nonetheless insisted on his own self-serving interpretation.

28. Literski then used CPUSA's inability to satisfy his inflated inventory demand as a pretext to declare CPUSA "out of trading terms" and to justify further tightening CPUSA's payment terms — including, in October 2024, refusing to release to CPUSA a shipment of product that had arrived at

port in North Carolina, notwithstanding evidence that CPUSA had timely paid all outstanding invoices.

29. Because Literski drafted the Distribution Agreement on Ecochem's behalf, any genuine ambiguity in Section 4.3.4 should be construed against him.

### D. Literski's Diversion of CPUSA's Customer, Harper Love, to a Competing Distribution Channel

30. HarperLove, Inc. ("Harper Love") has been a customer relationship built and serviced by CPUSA, and the Harper Love account and its associated revenue belong to CPUSA under the parties' agreements.

31. Over the objection of Spencer and Warll, Literski caused Ecochem to enter into a separate distribution arrangement with Harper Love covering the same Ecochem starch-removal product line and territory — the United States and South America — that CPUSA distributes, and has caused revenue that should be paid to and through CPUSA to instead be diverted to Ecochem and Harper Love directly.

32. On September 26, 2025, Literski emailed Spencer and Harper Love representative Jeff Buchanan, stating that "[b]oth Harper Love and CPUSA are distributors of the Ecochem system and product for the removal of starch for the USA and South America," and that "Neither company has

preferential treatment." A true and correct copy of the September 26, 2025 email is attached as **Exhibit D**.

33. On October 7, 2025, Harper Love's plant manager, Nicholas Colbert, confirmed in writing to Spencer that, in connection with a single purchase order, Harper Love had received 18 totes of Ecochem's evolution starch off ultra product shipped directly to it from Australia and 12 totes from CPUSA. A true and correct copy of the October 7, 2025 email communications between Nicholas Colbert and Spencer are attached as **Composite Exhibit E**.

34. Harper Love has also been repackaging and reselling Ecochem's ESO Ultra product in quantities smaller than full-tote quantities, notwithstanding that Ecochem, through Literski, has advised CPUSA that it may not do the same — a further instance of Literski affording preferential treatment to Harper Love that he denies to CPUSA.

35. By causing Ecochem to sell and ship product directly to Harper Love, and by affording Harper Love more favorable treatment than CPUSA, Literski has placed CPUSA in direct competition with Ecochem's own direct sales channel and with Harper Love, on terms Plaintiffs cannot verify are equivalent to the terms Ecochem demands of CPUSA.

36. This arrangement diverts business opportunities and revenue that properly belong to CPUSA and creates an irreconcilable conflict between

Literski's personal financial interest in Ecochem's direct sales to Harper Love and his fiduciary obligations to CPUSA and its minority members.

### E. Literski's Preferential Treatment of Ecochem's Other Distribution Channels and Withholding of Amounts Owed to CPUSA

37. Upon information and belief, Walla Walla Environmental is also selling or distributing Ecochem's ESO Ultra product in competition with an existing CPUSA account, resulting in lost revenue to CPUSA for which Plaintiffs have not been compensated.

38. Additionally, Ecochem has reimbursed Harper Love for one-half of the tariffs Harper Love incurs on ESO Ultra product, and has offered Harper Love rebates and marketing support, while Literski has caused Ecochem to withhold comparable tariff relief, rebates, and marketing support from CPUSA.

39. Ecochem has also failed to pay CPUSA rebates owed to it notwithstanding that CPUSA has provided Ecochem with all supporting documentation multiple times.

40. Ecochem has also failed to provide CPUSA with backup documentation supporting Invoice No. 4889, which CPUSA paid notwithstanding CPUSA's belief that the invoice may not be accurate, and Literski has refused to cause Ecochem to substantiate or correct it.

### F. Literski's Refusal to Obtain an ITIN, Exposing Spencer and Warll to Personal Tax Penalties

41. CPUSA has been classified as a partnership for federal tax purposes since its formation, pursuant to Section 4.4 of CPUSA's Operating Agreement, which requires that each member's allocable share of CPUSA's income, gains, deductions, losses, and credits be reported to that member and to the Internal Revenue Service, including via a Schedule K-1.

42. Properly reporting Literski's allocable share of CPUSA's income via a Schedule K-1 requires that Literski obtain and provide CPUSA with a United States Individual Taxpayer Identification Number ("ITIN").

43. Despite this requirement having existed since CPUSA's formation in July 2022, Literski has never obtained an ITIN.

44. CPUSA's accountant has advised that Literski needs an ITIN in order to issue a K-1 to him as is required by law, and Spencer has communicated this requirement to Literski.

45. Literski, however, has refused to obtain an ITIN claiming that as a foreigner he does not have to pay US income taxes.

46. If a domestic limited liability company (e.g., CPUSA) operates a trade or business in the United States and has "effectively connected taxable income" for a taxable year, and any portion of that income is allocable to a

foreign partner (e.g., Literski), the partnership is required to pay a withholding tax.

47. Pursuant to 26 USCS § 1446, when the foreign partner refuses to provide a valid ITIN, the partnership remains strictly liable for paying the withholding tax at the highest statutory rate on the foreign partner's allocable share.

48. Additionally, under 26 USCS § 6698, if a partnership required to file a return fails to file a return at the prescribed time, or files a return that fails to show the required information (such as the ITIN of its partners), the partnership is liable for a monthly penalty.

49. Crucially, this penalty is assessed directly against the partnership itself, not the individual non-compliant foreign partner pursuant to 26 USCS § 6698.

50. Consequently, the partnership's assets must be used to satisfy the penalty, reducing the equity and financial returns of the domestic members (Spencer and Warll).

51. As a direct result of Literski's failure to obtain an ITIN, Spencer and Warll have been unable to timely and accurately file their personal income tax returns reflecting CPUSA's tax attributes, exposing Spencer and Warll to penalties, fees, and interest assessed by taxing authorities that, upon information and belief, could exceed $100,000.

52. Literski's failure to obtain an ITIN results solely from his own neglect of an obligation squarely within his control, and any resulting penalties, fees, and interest should be borne by Literski personally and not by CPUSA or by Spencer and Warll individually.

### G. Literski's Refusal to Fund Workers' Compensation Coverage

53. CPUSA has not maintained a workers' compensation insurance policy because Literski has refused to authorize CPUSA to pay wages to Spencer or Warll sufficient to trigger the statutory requirement to carry such coverage, preferring instead to direct available funds toward funding customer installations.

54. Additionally, CPUSA hires 1099 independent contractors to make installations of Ecochem's equipment. By not having workers' compensation insurance, if one of these 1099 workers files a workers' compensation claim, this exposes CPUSA to substantial liability.

55. The State of Florida has previously threatened to shut down CPUSA's operations for lack of workers' compensation coverage and has advised CPUSA not to perform further installations without such coverage in place.

56. Notwithstanding this warning, Literski continues to refuse to authorize the payment of wages necessary to maintain workers' compensation

coverage, exposing CPUSA — and Spencer and Warll individually, as members responsible for the Company's operations — to regulatory sanction, potential forced closure, and personal liability under Florida law.

### H. Literski's Refusal to Grant CPUSA Exclusive Distribution Rights While Prohibiting Spencer and Warll from Competing

57. Although Literski holds a supermajority membership interest in CPUSA and personally controls Ecochem, he has refused to grant CPUSA exclusive distribution rights for Ecochem's products.

58. At the same time, pursuant to a separate distribution agreement between CPUSA and Dicar Inc. — the company for which Spencer and Warll serve as executives and that Warll is an owner of — Spencer and Warll are contractually prohibited from competing with CPUSA. Literski is subject to no comparable restriction and, as alleged above, has caused Ecochem to compete directly with CPUSA for the same customers and product lines.

### I. Resulting Damage to Spencer and Warll

59. As a direct and proximate result of Literski's conduct described above, CPUSA's value and profitability have been damaged by, among other things: (a) unfavorable and unilaterally-imposed payment terms with its sole product supplier; (b) preventing CPUSA from purchasing Ecochem products to fulfill customer requirements unless CPUSA agrees to prepay for the product in contravention of the specific payment terms of the Distribution Agreement;

(c) the diversion of the Harper Love relationship and related revenue to competing distribution channels; (d) the withholding of rebates, tariff relief, and marketing support afforded to competing distributors but denied to CPUSA; (e) the financial strain and lost business opportunities caused by Literski's improper insistence on, and misuse of, his self-serving interpretation of Section 4.3.4; and (f) the Company's inability to make any distributions to its members despite purchasing approximately $6,000,000 in product and, upon information and belief, generating substantial revenue.

60. As a direct and proximate result of this conduct, Spencer and Warll have been damaged by, among other things, the diminished value of their membership interests and the absence of any return on their combined $470,000 investment.

61. Spencer and Warll have also been separately and directly damaged by Literski's failure to obtain an ITIN, which has exposed them to penalties, fees, and interest on their personal tax returns that, upon information and belief, could exceed $100,000, and by the ongoing regulatory and personal-liability exposure created by CPUSA's lack of workers' compensation coverage.

## CONDITIONS PRECEDENT

62. Section 7.10 of CPUSA's Operating Agreement requires the members to "endeavor in good faith to first resolve all disputes arising under

or relating to th[e] agreement by mediation" before seeking "judicial intervention."

63. Plaintiffs satisfied this condition precedent. On August 27, 2025, Plaintiffs and Defendant voluntarily engaged in mediation with the Honorable Joseph Marx (Ret.) of Matrix Mediation, LLC regarding the disputes alleged herein.

64. Despite Plaintiffs' good-faith efforts, mediation did not resolve the parties' disputes, and Literski has continued the conduct described below. Judicial intervention is therefore proper under Section 7.10 of the Operating Agreement.

## COUNT I
## BREACH OF FIDUCIARY DUTY

65. Plaintiffs reallege and incorporate paragraphs 1 through 64 as if fully set forth herein.

66. CPUSA is a member-managed Florida limited liability company. Fla. Stat. § 605.04091 imposes on each member of a member-managed limited liability company fiduciary duties of loyalty and care to the company and to its other members.

67. Literski owed Spencer and Warll fiduciary duties of loyalty and care, including the duty to refrain from dealing with CPUSA on behalf of a party having an interest adverse to CPUSA, the duty to refrain from competing

with CPUSA, and the duty to discharge his obligations to CPUSA and its members with the good faith and care an ordinarily prudent person in a like position would exercise, including by refraining from intentional misconduct or knowing violations of law.

68. Literski breached these duties by, among other things: (a) causing CPUSA to purchase approximately $6,000,000 in product from Ecochem, a company he solely owns, while ensuring that no member of CPUSA ever received a distribution; (b) unilaterally rewriting CPUSA's payment terms with Ecochem based on his own unsupported assumptions and for his own financial benefit; (c) preventing CPUSA from purchasing Ecochem products unless CPUSA prepaid for the products which is contrary to the specific terms of the Distribution Agreement; (d) threatening to sell and upon information and belief actually selling Ecochem products directly to CPUSA's customers; (e) manufacturing and exploiting a self-serving interpretation of the ambiguous stock provision he personally drafted in order to declare CPUSA in default and further tighten its payment terms; (f) diverting the Harper Love customer relationship and associated revenue to a competing distribution arrangement for his personal financial benefit, and affording Harper Love repackaging privileges, tariff relief, rebates, and marketing support that he has denied to CPUSA; (g) permitting or facilitating Walla Walla Environmental's competing sale of Ecochem product against an existing

CPUSA account; (g) withholding rebates owed to CPUSA, (h) refusing to substantiate inaccurate invoices despite CPUSA's repeated requests; and (i) refusing to authorize CPUSA to pay wages sufficient to maintain workers' compensation coverage notwithstanding the State of Florida's warning that CPUSA's operations could be shut down and that installations should not continue without such coverage.

69. As a direct and proximate result of Literski's breaches of fiduciary duty, Spencer and Warll have suffered damages, including but not limited to the diminished value of their membership interests, the loss of the benefit of their combined $470,000 investment, and exposure to regulatory and personal-liability risk arising from CPUSA's lack of workers' compensation coverage.

70. Literski's conduct was intentional, self-interested, and undertaken with reckless disregard for the rights of Spencer and Warll, entitling Plaintiffs to punitive damages.

WHEREFORE, Plaintiffs Spencer and Warll demand judgment against Defendant Literski for compensatory damages, punitive damages, pre- and post-judgment interest, costs, and such other and further relief as the Court deems just and proper.

**COUNT II**
**BREACH OF CONTRACT**

71. Plaintiffs reallege and incorporate paragraphs 1 through 64 as if fully set forth herein.

72. CPUSA's Operating Agreement is a valid and binding contract among Spencer, Warll, and Literski.

73. Section 4.4 of the Operating Agreement requires that CPUSA be classified as a partnership for federal (and, if applicable, state) tax purposes, which necessarily requires each member, including Literski, to furnish CPUSA with the taxpayer identification information needed to report that member's allocable share of CPUSA's income.

74. Literski has breached the Operating Agreement by refusing, since CPUSA's formation in July 2022, to obtain and provide CPUSA with an ITIN, thereby preventing CPUSA from properly reporting Literski's allocable share of its income and preventing Spencer and Warll from timely and accurately filing their own personal tax returns.

75. Additionally, under 26 USCS § 6698, CPUSA is liable for a monthly penalty if it fails to file a return at the prescribed time, or files a return that fails to show Literski's the required ITIN information.

76. The partnership's assets must be used to satisfy the penalty, thereby reducing Spencer's and Warll's equity in CPUSA and their prospective financial returns.

77. As a direct and proximate result of this breach, Spencer and Warll have been exposed to penalties, fees, and interest on their personal tax returns that, upon information and belief, could exceed $100,000, and their equity in CPUSA and their prospective financial returns has been reduced.

WHEREFORE, Plaintiffs demand judgment against Defendant Literski for compensatory damages — including all penalties, fees, and interest incurred or to be incurred by Spencer and Warll as a result of Literski's failure to obtain an ITIN — pre- and post-judgment interest, costs, and such other and further relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury on all issues so triable.

Dated this 16th day of September, 2026.

BLEAKLEY BAVOL DENMAN & GRACE

*/s/ Richard Rodriguez*
J. Ronald Denman, Esq.
Florida Bar No.: 863475
Richard Rodriguez, Esq.
Florida Bar No.: 0091239
15316 N. Florida Avenue
Tampa, Florida 33613

Telephone: (813) 221-3759
Facsimile: (813) 221-3198
rdenman@bbdglaw.com
mroseth@bbdglaw.com
eservice@bbdglaw.com